IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEITH M. CASSELLS,

      Plaintiff,

vs.

DR. MEHTA, et al.,

      Defendants.

No. CIV S-04-1798 FCD EFB P

<u>ORDER AND FINDINGS
AND RECOMMENDATIONS</u>

Plaintiff is a prisoner without counsel seeking relief for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on the September 15, 2004, verified complaint in which plaintiff claims that: (1) defendants Andreasen, Mehta, Donahue and Bick were deliberately indifferent to plaintiff's serious medical needs by delaying for seven months before sending plaintiff for a second follow-up appointment for disc fusion surgery; (2) defendants Dr. Mehta and Dr. Bick failed in December 2003 to provide plaintiff with an eggcrate mattress to ease discomfort in plaintiff's arms, hands and neck; and (3) Dr. Mehta was deliberately indifferent to plaintiff's neck condition by substantially delaying "revision surgery" on plaintiff's neck. The matter is now before the court on defendants' motion for summary judgment.

////

////

1

## I. Facts

At all times relevant to this action, plaintiff was a prisoner at California Medical Facility (CMF). Defendant Dr. Mehta was a physician at CMF, and was one of plaintiff's treating physicians. Defs.' Mot. for Summ. J., Ex. C, Mehta Dec., at 2. Defendants Andreasen and Bick were Chief Medical Officers (CMO) at CMF. *Id.*, Ex. B., Andreasen Dec., at 1; Ex. E, Bick Dec., at 1. Dr. Andreasen was responsible for reviewing and either granting or denying requests for medical treatment submitted to the Utilization Management Office, which processes requests for medical treatment. Andreason Dec., at 2. He also chaired the Medical Authorization Review committee, which oversees medical care at CMF and has the authority to approve, deny or defer requests for treatment. *Id*. Defendant Khoury was the Chief Deputy of Medical Clinical Services at CMF. Defs.' Mot. for Summ. J., Ex. D. Khoury Dec., at 1. Defendant Donahue was a nurse at CMF. *Id.*, Ex. E, Donahue Dec., at 1. His duties included interviewing prisoners who filed grievances related to medical issues and to relay the information obtained to the chief medical officers so that they could conduct the first level review. *Id*., at 2.

In 1997, plaintiff incurred neck and back injuries, including herniated discs in his neck, at the hands of prison guards. Defs.' Mot. for Summ. J., Ex. A, Pl.'s Dep. at 36. Therefore, on May 8, 2001, a physician[1] authorized plaintiff to have a special pillow and an eggcrate mattress for one year. Medical Supply Prescription of May 8, 2001, Attached as Exhibit to Pl.'s Opp'n, filed August 22, 2006.

On January 10, 2002, Dr. Remington of Pacific Neurosurgery Medical Associates performed "cervical disckectomy infusion" on plaintiff. Sept. 29, 2003, Remington Letter, Attached as Exhibit to Pl.'s Opp'n. While plaintiff's condition initially improved, within several months plaintiff began to suffer neck pain, back pain and numbness in his upper and lower extremities. *Id.* Dr. Remington saw plaintiff on August 14, 2002, and recommended that

---

[1] The signature of this doctor is illegible.

plaintiff have a follow-up appointment in 90 days.  First Level Review of  March 14, 2003, Attached as Exhibit to Pl.'s Opp'n.  However, plaintiff did not see Dr. Remington again until April 2, 2003.  At deposition, plaintiff testified that sometime between August of 2002 and December of 2002, he saw defendant MTA Donahue in passing and mentioned that he had not had the follow-up appointment with Dr. Remington.  Defs.' Mot. for Summ. J., Ex. A, Pl.'s Dep., at 22-23.  Plaintiff further testified that defendant Donahue did nothing to ensure that someone made the appointment, but he could not explain how he knew this.  *Id*., at 20.  Defendant Donahue has submitted a declaration stating that when plaintiff filed a grievance complaining of the delay in returning to Dr. Remington, he interviewed plaintiff and related the information gleaned therefrom to the Chief Medical Officers.  Defs.' Mot. for Summ. J., Ex. F, Donahue Dec., at 2.  Defendant Andreasen, who reviewed plaintiff's grievance on the first formal level of review, found that this information was given to Dr. Mehta, but not to the Utilization Management Committee ("UMC"), which was responsible for arranging the appointment. March 14, 2003, Review of First Level Appeal, Attached as Exhibit to Pl.'s Opp'n; Andreasen Dec., at 3.  Without this information, the UMC could not arrange the appointment.  March 14, 2003, Review of First Level Appeal.  The record does not disclose who was responsible for giving Dr. Remington's request to the UMC.

As stated above, plaintiff saw Dr. Remington on April 2, 2003.  However, the record does not reveal what transpired at this appointment.    Sept. 29, 2003, Remington Letter, Attached as Exhibit to Pl.'s Opp'n.  On April 15, 2003, Dr. Bick signed an evaluation finding that plaintiff had degenerative disc disease and herniated lumbar discs.  Functional Capacity Evaluation of April 15, 2003, Attached as Exhibit to Pl.'s Opp'n.  Dr. Bick also noted that plaintiff had undergone cervical fusion surgery, that x-rays taken in March 2003, suggested that the bones had fused, and that plaintiff could not sit for more than one hour before he had to stand, walk or lie down. Functional Capacity Evaluation of April 15, 2003, Attached as Exhibit to Pl.'s Opp'n.

On April 24, 2003, plaintiff saw Dr. Capazolli, but Dr. Remington's report of the April 2, 2003, appointment was not in plaintiff's chart. Physician's Order of April 24, 2003, Attached as Exhibit to Pl.'s Opp'n. Dr. Capazolli determined that plaintiff's cervical bones had not fused, possibly because plaintiff was a smoker and was undergoing interferon treatment. *Id.* He ordered plaintiff to return the following week *Id.* When plaintiff returned on April 30, 2003, the report still was missing. Progress Note of April 30, 2003, Attached as Exhibit to Pl.'s Opp'n. Dr. Capazolli requested the medical records supervisor to send a copy of the report and referred plaintiff back to Dr. Remington. *Id.*

On May 5, 2003, plaintiff saw prison medical staff for "acute locking of his neck and R shoulder [with] severe pain." Progress Note of May 5, 2003, Attached as Exhibit to Pl.'s Opp'n. He was referred to the neurology clinic, where he was able to "flex his neck to the right with discomfort." *Id.* On May 7, 2003, neurological medical staff noted, "Dr. R's report <u>still</u> not on chart. Called U/M to expedite referral back to Dr. R. Reviewed x-rays from March 2003 - no bone fusion - but hardware well-connected." Progress Note of May 7, 2003, Attached as Exhibit to Pl.'s Opp'n (emphasis in original). The neurological staff believed that plaintiff's neck should be treated before his lower back. *Id.* Thus, they recommended that plaintiff see the neurosurgeon before obtaining lower back treatment. *Id.* On May 7, 2003, Dr. Bick, signed a document stating that plaintiff's cervical vertebrae had not fused and recommending that plaintiff be permitted to avoid activities involving neck strain. Functional Capacity Evaluation of April 15, 2003, Attached as Exhibit to Pl.'s Opp'n.

On September 29, 2003, plaintiff saw Dr. Remington, following which he wrote a letter directed to the Chief Medical Officer[2] of CMF. *See* Defs.' Mot. for Summ. J., Ex. B, Andreasen Dec., at 3. In it, he stated that a June 18, 2003, MRI verified that plaintiff suffered from disc disease in his lower back and August 20 2003 x-rays verified non-union of plaintiff's cervical

---

[2] Dr. Remington wrote not to a specific person, but to the Chief Medical Officer. Therefore, Andreasen and Bick were on notice of its contents.

1 bones. Sept. 29, 2003, Remington Letter, Attached as Exhibit to Pl.'s Opp'n.  He also stated that
2 by April 2, 2003, plaintiff's condition was worse than before the surgery, citing plaintiff's report
3 of numbness in his feet, severe back pain and pain shooting from the backs of his knees into his
4 toes. *Id.*  Dr. Remington believed surgery likely would be necessary, but recommended that
5 plaintiff undergo a "discogram,"[3] before making a decision about the most appropriate course of
6 treatment.  *Id.*; Andreasen Dec., at 3.  The MAR committee, of which Dr. Andreasen was a
7 member, considered these opinions and decided that further evaluation was necessary before
8 approving the discogram.  Thus, on October 15, 2003, Dr. Andreasen deferred the discogram in
9 order to obtain input from a neurologist, to have the MRI re-evaluated.  Andreasen Dec., at 3.
10 He referred plaintiff to the University of California San Francisco Medical Center (UCSF-MC)
11 for a second opinion about whether plaintiff needed surgery and whether he was a suitable
12 candidate therefor.  *Id.*

13 On December 5, 2003, Dr. Mehta approved plaintiff's continued use of an eggcrate
14 mattress because plaintiff was "prone to decubitis ulcers."[4]  Dr. Bick refused to approve
15 continued use of the eggcrate mattress, finding that "[t]he listed diagnoses do not make patient
16 prone to decubiti."

17 On December 29, 2003, Dr. Capazzoli, a neurologist, examined plaintiff.  Physician's
18 Progress Notes Attached to Complaint.  In May 2004, plaintiff filed an appeal concerning the
19 delay in receiving the surgery suggested by Dr. Remington. Compl., Ex. A.  Defendant
20 Andreasen reviewed it on the first formal level, found that plaintiff had an appointment
21 scheduled at UCSF-MC, and that after that appointment a decision would be made about whether
22 to refer plaintiff for surgery as suggested by Dr. Remington.  *Id.*  Defendant Khoury reviewed

---

[3] Neither party defines this term and it was not in the court's medical dictionary.

[4] This is "an ulceration caused by prolonged pressure in a patient allowed to lie still in bed for a long period of time; called also decubitus, bed sore, and pressure sore."  *Dorland's Illustrated Medical Dictionary*, at 1782 (27th ed. 1988).

5

the appeal on the second formal level of review, found that plaintiff was scheduled for a neurosurgical evaluation at UCSF-MC and that a decision about whether to proceed with surgery would be made after the appointment. *Id.* He partially granted the appeal. *Id.* Plaintiff went to his appointment at UCSF-MC, and as a result, around July 7, 2004, Dr. Larson of UCSF-MC determined that plaintiff had non-union of the cervical bones and that the condition require re-fusion. The surgery was performed at UCSF-MC on September 29, 2004. Andreasen Dec., at 4. The process of arranging for the surgery was time-consuming because it was necessary to coordinate the schedules of several specialists with the prison's transportation schedule. *Id*.

## II. Evidentiary Objections

Defendants object to documentary evidence plaintiff submitted with his opposition. They object to medical records, documents styled, "Utilization Management Program," "Plata Procedures," "Clinical Services Administrative Policy and Procedure Manual," "Inmate-Patient Orientation Handbook to Health Care Services," on the grounds that they are hearsay, they lack foundation and are not properly authenticated.  Defendants object to administrative appeal documents on the ground that they are hearsay and they lack foundation. For the reasons explained, the objections are overruled.

Plaintiff's evidence and defendants' objections cannot be divorced from the nature of this proceeding, i.e., summary judgment, in which defendants are the moving parties. *See Burch v. Regents of the University of California*, 433 F.Supp.2d 1110, 1118-1124 (E. D. Cal. 2006). The portion of the rule governing such a motion supported by affidavits and records provides that the affidavits "shall set forth such facts as would be admissible in evidence . . . ." Fed. R. Civ. P. 56(e). On summary judgment, the non-moving party's evidence need not be in a form that is admissible at trial. *See Burch*, 433 F.Supp.2d at 1119 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Instead, a court is concerned with the admissibility of the contents of the evidence. *Id.* Thus, on summary judgment, "objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's

6

evidence." *Burch*, 433 F.Supp.2d at 1119. Accordingly, as long as a party submits evidence which, regardless of its form, may be admissible at trial, it may be considered on summary judgment. *Id.* at 1120.

The court now turns to defendants' objection that plaintiff's evidence lacks a proper foundation or authentication. In order properly to support or oppose summary judgment, the party relying on affidavits and records must lay a proper foundation. *Beyne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). The court agrees that "whether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is, however, questionable." *Burch*, 433 F.Supp.2d at 1120. "[W]here the objecting party does not contest the authenticity of the evidence submitted, but nevertheless makes an evidentiary objection based on purely procedural grounds," then the court should consider the evidence. *Id.* In such a situation, it would appear equally probable that the documents are what they purport to be as it is that they are not. *See Id.*

Here, defendants do not actually contest the authenticity of the documents plaintiff has submitted. Defendants' general objection is particularly suspect because all the documents plaintiff submits would find their source in the prison system, either in plaintiff's files or in the prison bureaucracy. Thus, if there were a valid basis for contesting their authenticity, defendants could unearth and present it. But they have not. Therefore, all defendants' objections for lack of proper foundation and lack of authentication are overruled.

Defendants also object on hearsay grounds. This objection is overruled for two reasons. The first is the form of the objection and the second is the nature of the non-moving party's burden on summary judgment. The objections are *pro forma* in that defendants object to entire documents, not particular statements. An objection based on hearsay inherently is bound to the context in which the allegedly objectionable evidence is offered. *See Burch*, 433 F.Supp.2d at 1122 ("even seemingly appropriate objections based on hearsay and failures to authenticate/lay a foundation are difficult to address away from the dynamics of trial.") Insofar as a letter or record

1  may on its face constitute hearsay, the particular statements upon which plaintiff relies may very
2  well either be admissible nonetheless or may not be hearsay, depending on the purpose for which
3  plaintiff offers the statement. "The court is not inclined to comb through these documents,
4  identify potential hearsay, and determine if an exception applies - all without guidance from the
5  parties." *Id.* at 1124. Thus, to prevail on a hearsay objection, defendants must object to
6  particular statements and explain the objection. Defendants' failure to do so is sufficient basis
7  for overruling the objection.

8  With respect to the nature of this proceeding, "the court cannot ignore the fact that a non-
9  movant in a summary judgment setting is not attempting to prove its case, but instead seeks only
10 to demonstrate that a question of fact remains for trial." *Burch*, 433 F.Supp.2d at 1121. The
11 court thus "treat[s] the opposing party's papers more indulgently than the moving party's
12 papers." *Id.* (*citing, Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985)). While a court
13 need not ignore the evidentiary ramifications of a declaration based nearly entirely on hearsay,
14 *see Burch*, 433 F.Supp.2d at 1121 (noting that the Ninth Circuit does not uniformly apply the
15 principle of indulgence), it is worth pointing out that plaintiff proceeds without counsel.
16 Furthermore, he does not rely on evidence which on its face presents evidentiary obstacles which
17 would prove insurmountable at trial. *See Id.* at 1122 (noting that at trial, "when a party raises
18 valid evidentiary objections, the opposing party will have an opportunity to present the evidence
19 in an alternative and admissible form."). Insofar as there may be valid hearsay objections, they
20 are better left for trial, if there is to be one.

21 For these reasons, the defendants' objections to the plaintiff's evidence sumitted in
22 opposition to this motion is denied.

23 **III. Summary Judgment Standard**

24 Summary judgment is appropriate when there is no genuine issue of material fact and the
25 movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v.*
26 *////*

*Catrett*, 477 U.S. 317, 322 (1986).[5]  The utility of Rule 56 to determine whether there is a "genuine issue of material fact," such that the case must be resolved through presentation of testimony and evidence at trial is well established:

> [T]he Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis added).  Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts are thereby rendered immaterial.  *Celotex,* 477 U.S. at 323.

---

[5] On October 5, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

9

1    With these standards in mind, it is important to note that plaintiff bears the burden of
2 proof at trial over the issue raised on this motion, i.e., whether the defendant acted with
3 deliberate indifference to the plaintiff's safety. Equally critical is that "deliberate indifference"
4 is an essential element of plaintiff's cause of action. Therefore, to withstand defendant's motion,
5 plaintiff may not rest on the mere allegations or denials of his pleadings. He must demonstrate a
6 genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). He
7 must rely on evidence based upon which a fair-minded jury "could return a verdict for [him] on
8 the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

9 **IV. Analysis**

10   "As to materiality, the substantive law will identify which facts are material. Only
11 disputes over facts that might affect the outcome of the suit under the governing law will
12 properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Here, plaintiff's
13 action arises under 42 U.S.C. § 1983 and the Eighth Amendment. To prevail at trial, he must
14 prove that the defendant deprived him of his Eighth Amendment rights while acting under color
15 of state law. To prove an Eighth Amendment violation, plaintiff must show by a preponderance
16 of competent evidence that the defendant knew plaintiff faced a risk of harm that "is not one that
17 today's society chooses to tolerate," and that the defendant was "deliberately indifferent" to that
18 risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). As discussed below, plaintiff has
19 failed to establish a genuine dispute for trial over this issue.

20   Plaintiff concedes that he sues defendants Andreasen, Donahue and Bick in their
21 supervisory capacity and that not one of them was a primary care physician responsible for
22 dictating or directing plaintiff's care. Ordinarily, a person is subject to liability under 42 U.S.C.
23 § 1983 if he commits or directs an act or omission that violates a plaintiff's constitutional rights.
24 *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *Taylor v. List*, 880 F.2d 1040, 1045 (9th
25 Cir. 1989). "Supervisory liability exists even without overt personal participation in the
26 offensive act if supervisory officials implement a policy so deficient that the policy itself is a

10

repudiation of constitutional rights and is the moving force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989) (quotation marks and citation omitted). To hold a supervisor liable for the unconstitutional acts of his subordinates, there must be a "causal connection between the supervisor's wrongful conduct and the constitutional violation." *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc). This connection may be established by showing the supervisor personally participated in or directed the violation, *Taylor*, 880 F.2d at 1045, implemented a policy so deficient as to be the moving force of the violation, *Hansen*, 885 F.2d at 646, or by omitting to perform an act he was legally required to do, *Johnson*, 588 F.2d at 743, such as failing to take adequate steps to address a violation of which he knew or should have known. *See Jones v. Williams*, 297 F.3d 930, 937 & fn. 4 (9th Cir. 2002). Therefore, to survive summary judgment with respect to his claims against Andreasen, Donahue and Bick, plaintiff must adduce evidence that they were involved in an Eighth Amendment violation in one of these ways.

Prison officials violate the Eighth Amendment when they engage in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate." *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference "may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). When a prisoner alleges a delay in medical treatment, he must show the delay caused an injury. *See McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir.1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (en

11

banc); *see also Wood v. Housewright*, 900 F.2d 1332, 1334-35 (9th Cir.1990). The prolonged experience of pain while waiting for medical attention can establish deliberate indifference. *See Hunt. Dental Dep't*, 865 F.2d 198, 200-01 (9th Cir.1989) (concluding that allegations of three-month delay in replacing dentures, which caused pain to prisoner, stated a claim of deliberate indifference). However, the question of whether additional treatment is necessary "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. Prison physicians will not be found to have been deliberately indifferent with respect to such a decision as long as the decision is medically acceptable under the circumstances. *See Jackson v. McIntosh,* 90 F.3d 330, 331 (9th Cir. 1996) ("Where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law.").

### A. Seven Month Delay Between Appointments with Dr. Remington

As noted above, plaintiff alleges that defendants Andreasen, Mehta, Donahue and Bick were deliberately indifferent to plaintiff's serious medical needs by causing a seven-month delay between appointments with Dr. Remington. Defendants Andreasen, Mehta, Donahue and Bick contend there is no genuine dispute about whether they were deliberately indifferent to plaintiff's serious medical needs. They assert there is no evidence that they knew of Dr. Remington's request but delayed approving it. It is undisputed that on August 14, 2002, Dr. Remington requested that plaintiff return within 90 days. It also is undisputed that plaintiff did not see Dr. Remington again until at least April 2, 2003. To determine whether any of these defendants are subject to liability, it is necessary to determine whether there is evidence that any of them knew of Dr. Remington's recommendation. The court will examine the facts with respect to each defendant in turn.

Dr. Mehta was one of plaintiff's treating physicians. Plaintiff's primary care physician was notified of Dr. Remington's request. Assuming *arguendo* that Dr. Mehta was the primary care physician, he knew of the request. But it is undisputed that the UMC was responsible for

1  arranging the appointment and that it was not aware of the request.  Plaintiff submits no evidence
2  that the primary care physician can circumvent the UMC and make an appointment for a prisoner
3  to see a specialist outside the prison.  Thus, even if Dr. Mehta was responsible for conveying the
4  request to the UMC (and there is no evidence to this effect), he would be subject to liability only
5  if he intentionally refused to convey it or did something to interfere with the granting of the
6  request once conveyed.  As the party with the burden of proof at trial, plaintiff has the burden of
7  adducing evidence on this point in summary judgment proceedings.  Plaintiff has failed in this
8  regard.  While Dr. Mehta may have been careless, negligence is not co-equal with deliberate
9  indifference.  *Estelle*, 429 U.S. at 106.  On the evidence before the court, a reasonable jury could
10 not find that defendant Mehta, despite knowing of Dr. Remington's August 14, 2002, request,
11 interfered with plaintiff's treatment by intentionally refusing to convey the request to the UMC
12 or by interfering with the request after it was conveyed.  Defendant Dr. Mehta is entitled to
13 judgment as a matter of law on this claim.

14      Plaintiff also fails to satisfy his burden on this claim with respect to Andreasen.  It is
15 undisputed that Andreasen became aware that Dr. Remington's request for a follow-up
16 examination had not been fulfilled once plaintiff filed his grievance.  In response, Dr. Andreason
17 promised that the papers required for the follow-up appointment would be processed.  In less
18 than 20 days, plaintiff returned to Dr. Remington.  Plaintiff no doubt would like the court to
19 conclude that prison officials act only when a formal grievance is filed.  But plaintiff submits no
20 evidence that Dr. Andreasen, who was on the UMC, knew of Dr. Remington's request before
21 plaintiff filed the grievance.  In fact, Dr. Remington's April 2, 2003, report was not timely placed
22 into plaintiff's medical file.  There is no evidence about who is responsible for filing and
23 distributing these records.  On this evidence, no reasonable jury could find that Dr. Andreasen
24 was the responsible individual.  Therefore, defendant Dr. Andreasen is entitled to judgment as a
25 matter of law on this claim.
26 ////

1    With respect to defendant Donahue, the outcome is the same.  Plaintiff asserts that he
2 notified defendant Donahue in passing that his appointment with Dr. Remington was delayed.
3 Defendant Donahue submitted evidence that his only involvement was to interview plaintiff
4 about the lack of a follow-up appointment and to relate that information to Dr. Andreasen.  Even
5 if plaintiff did notify defendant Donahue in passing, the consequence of this fact is a matter of
6 pure speculation.  There is no evidence that Donahue was in a position to ensure that the
7 appointment was made.  He may have forgotten to convey the information to a person with such
8 authority.  He might not have realized the significance of the information at the time.  He might
9 have told a superior, who himself failed to act.  There are a number of speculative possibilities.
10 But a genuine issue of material fact cannot be based on speculation.  It must be base on evidence
11 that could justify a judgment or verdict in favor of the non-moving party over the issue in
12 question.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  On the evidence in the record,
13 no reasonable jury could find in plaintiff's favor on this issue.  Therefore, defendant Donahue is
14 entitled to judgment as a matter of law on this claim.

15    Finally, the court finds there is no genuine issue for trial about defendant Bick's
16 involvement.  The evidence shows that Dr. Bick did nothing with respect to plaintiff's health
17 care until April 15, 2003, when he signed an evaluation finding that plaintiff had degenerative
18 disc disease.  There is no evidence that either of these defendants in any way caused the delay
19 between plaintiff's August 14, 2003, appointment with Dr. Remington and the recommended
20 follow-up appointment.  No reasonable jury could find for plaintiff, and defendants Donahue and
21 Bick are entitled to judgment as a matter of law.

22    **B.  Delay of Surgery**

23    Plaintiff claims that defendant Dr. Mehta delayed the revision surgery that Dr.
24 Remington suggested.  Dr. Mehta contends that there is no evidence that he caused the delay.
25 Dr. Remington raised the specter of revision surgery in his letter dated September 29, 2003.  He
26 also recommended that plaintiff undergo a "discogram," before deciding whether to proceed with

surgery. It is undisputed that plaintiff did not undergo the surgery until a year later, on September 29, 2004. Defendants have submitted evidence that the MAR committee wanted other opinions about the necessity of surgery and about whether plaintiff was a suitable candidate for it before approving the surgery. Therefore, the committee referred plaintiff to a neurologist, Dr. Capazzolli, and to a surgeon at UCSF-MC, Dr. Larson. There is no evidence that Dr. Mehta was on the MAR. Nor is there any evidence that seeking these opinions was contraindicated in plaintiff's case. On this evidence, no reasonable jury could find that Dr. Mehta knew plaintiff required revision surgery, but acted to either directly or indirectly cause delay. No reasonable jury could find in plaintiff's favor; therefore, defendant Mehta is entitled to judgment as a matter of law on this claim.

**C. Denial of Eggcrate Mattress**

Plaintiff claims that in December 2003, defendants Mehta and Bick failed to provide plaintiff with an eggcrate mattress to ease discomfort in his arms, hands and neck. Defendants contend that there is no evidence they knew that failing to renew plaintiff's authorization for an eggcrate mattress posed a serious risk to plaintiff's health. Defs.' Mot. for Summ. J., at 11. It is undisputed that about seven months before plaintiff's initial surgery, the Chief Medical Officer[6] authorized plaintiff to have an eggcrate mattress and to have a cervical pillow for herniated dics in plaintiff's neck, and that about two weeks after the surgery the Chief Medical Officer approved plaintiff's use of a wedge pillow because of the surgery. On December 5, 2003, Dr. Mehta recommended plaintiff have an eggcrate mattress for bed sores. Dr. Bick denied the mattress because plaintiff was not prone to bedsores. It is not clear from the record why plaintiff was given an eggcrate mattress for herniated cervical discs if such a mattress is not medically indicated for this condition. However, nothing in the record suggests that plaintiff's post-operative condition made the special mattress a medical necessity. Thus, no reasonable jury

---

[6] The signature is illegible.

could conclude that Dr. Mehta was deliberately indifferent by recommending an eggcrate mattress for bedsores and not plaintiff's post-operative condition. Neither could a reasonable jury find Dr. Bick was deliberately indifferent by refusing to authorize the mattress. Therefore, defendants Mehta and Bick are entitled to judgment as a matter of law.

**D. Absence of Allegations Against Defendant Khoury**

It is unclear why plaintiff named Nadim K. Khoury as a defendant. The complaint makes no specific allegations against him. Because plaintiff fails to state a claim against defendant Khoury, judgment must be entered in this defendant's favor as well.

**V. Conclusion**

Accordingly, it is ORDERED that defendants' objections are overruled.

Furthermore, it is hereby RECOMMENDED that defendants' July 21, 2006, motion for summary judgment be granted and that judgment be entered in their favor.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 17, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE